**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

ROSE BRAVO,

               Plaintiff,

v.

UNION COUNTY, UNION COUNTY
BOARD OF ELECTIONS, DENNIS
KOBITZ,

               Defendants.

Civ. No. 12-2848 (DRD)

**O P I N I O N**

*Appearances by:*

LAW OFFICE OF FRED SHAHROOZ SCAMPATO
By: Fred Shahrooz Scampato, Esq.
445 East Broad Street
Westfield, New Jersey 07090

David Rostan, Esq.
Building One
248 Columbia Turnpike
Florham Park, New Jersey 07932

       *Attorneys for Plaintiff*

KOLOGI SIMITZ, COUNSELORS AT LAW
By: Edward J. Kologi, Esq.
    Michael S. Simitz, Esq.
923 N. Wood Avenue
Linden, New Jersey 07036

       *Attorneys for Defendant Dennis Kobitz.*

ROTH D'AQUANNI, LLC
By: Allen C. Roth, Esq.
150 Morris Avenue, Suite 206
Springfield, New Jersey 07081
    *Attorneys for Defendant Union County Board of Elections*

**DEBEVOISE, Senior District Judge**

This matter arises out of the discipline and ultimate termination of Plaintiff Rose Bravo's employment with the Union County Board of Elections (the "BOE"). On April 20, 2012, Ms. Bravo filed a Complaint in New Jersey Superior Court against Union County, the BOE, and Dennis Kobitz, asserting claims under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2651(b) et seq. and New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 et seq. The Complaint was removed to this Court on May 11, 2012, pursuant to 28 U.S.C. § 1446(b). On December 6, 2012, Ms. Bravo filed an Amended Complaint with additional factual allegations in support of her claims.

The Union County Board of Elections and Mr. Kobitz now move for Summary Judgment in their favor on all of Ms. Bravo's claims, while Ms. Bravo moves for Summary Judgment in her favor on her claim for FMLA interference. For the reasons set forth below, Defendants' motion is granted with respect to Ms. Bravo's NJLAD claims, in their entirety, and her FMLA claims, as they relate to her sinus surgery in 2011, but denied with respect to her other FMLA claims. Ms. Bravo's motion is denied in its entirety.

## I.    BACKGROUND

Ms. Bravo was employed by the BOE as a computer terminal operator and elections clerk from September 11, 1999 through December 31, 2011.[1] During that time, she suffered from post-traumatic stress disorder ("PTSD"), fibromyalgia, asthma, and sinus disease. These

---

[1] Under N.J.S.A. 19:31-2, BOE employees serve one-year terms and must be reappointed on an annual basis in order to continue their employment. Plaintiff was reappointed thirteen times to her position at the BOE.

ailments made it difficult for her to perform her work and required certain accommodations and leaves of absence.

On December 15, 2006, Ms. Bravo discovered her supervisor's dead body at work on the second floor of the BOE building, which resulted in PTSD and a short leave of absence. Sometime in 2007, Ms. Bravo asked to be moved to another work site. This request was denied because the BOE only had one building. Instead, she was moved to the first floor. Four months later, she was moved back to the second floor, at her own request, because she did not like the work environment on the first floor.

Ms. Bravo remained on the second floor from 2007 to 2009, at which point she was moved back to the first floor along with several other BOE employees. Ms. Bravo did not enjoy working on the first floor in large part because she did not have a phone at her desk until 2011. Between 2009 and 2011, Ms. Bravo's supervisors spoke to her on a number of occasions about the quality and speed of her work.

Mr. Kobitz is the BOE's administrator. In this capacity, he manages the BOE's day-to-day operations and holds the power to recommend that an employee be reappointed or not reappointed. However, only the BOE Commissioners have the authority to reappoint or not reappoint an employee.

At some point, Ms. Bravo asked Mr. Kobitz to leave the BOE and be transferred to a different position with Union County. Mr. Kobitz told Ms. Bravo that she could not be transferred because she was employed solely by the BOE, not Union County, and that she would instead have to apply for a new position. Ms. Bravo made similar requests of Union County human resources personnel but was told she was not eligible to be transferred.

Mr. Kobitz is also in charge of administering the Union County FMLA policy to BOE employees and enforcing it. However, he admitted in deposition to having neither read the policy, nor consulted it in deciding whether to grant FMLA leave to a BOE employee. <u>See</u> (Rostan Cert., Ex. 6.) Under the policy, Union County and BOE employees can take up to twelve weeks of unpaid leave for, among other things, "a period of incapacity of more than three consecutive calendar days that involves either treatment two or more times by a healthcare provider or treatment by a healthcare provider on at least one occasion which results in a regimen of continuing treatment such as physical therapy or a medication regimen." (Rostan Cert., Ex. 3.)

Sometime in 2009 or 2010, Joanne Arena, the BOE's deputy administrator, and Mr. Kobitz reviewed Ms. Bravo's and three other BOE employees' attendance records and believed they were suffering from attendance issues. In 2010, Ms. Bravo was entitled to 26 sick days—15 allotted to her for that year and 11 having been carried over from 2009. Between January 1, 2010 and June 30, 2010, Ms. Bravo took 12.5 sick days. She then took 32 days of leave from June 30, 2010 through August 27, 2010 to care for her mother who was undergoing surgery. Ms. Bravo's attendance record indicates that thirty and one-half of those days were "FMLA with pay" that counted against her allotted sick and vacation days. (Simitz Cert., Ex. D.) The remaining one and a half days were "FMLA w/o pay" and were not applied against her allotted sick or vacation days. (<u>Id.</u>) According to Ms. Bravo, Mr. Kobitz told her that in order to take leave to care for her mother, she would have to exhaust all of her remaining sick and vacation time and then use FMLA leave to cover the remainder.

According to Defendants, Ms. Bravo then took five unpaid sick days that same year after returning from FMLA leave. The record shows that Ms. Bravo's pay was deducted for those five days, but fails to indicate that they were in fact sick days. <u>See</u> (Simitz Cert., Ex. H.)

Sometime between September 14, 2010 and September 23, 2010, Mr. Kobitz called Terry Pacheco, a Union County human resources officer, to complain that Ms. Bravo had used up all of her sick time. He noted that she had previously been warned about her use of sick time and therefore wanted to discipline her. On December 21, 2010, at the BOE Commissioners' annual meeting, Mr. Kobitz recommended that Ms. Bravo and the three other individuals he previously discussed with Ms. Arena be placed on probation for the following year due to inadequate attendance. Consequently, they were placed on probation for that reason for 2011.

The Union County Disciplinary Action Manual allows for progressive discipline of chronic or excessive absenteeism. <u>See</u> (Rostan Cert., Ex. 1.) Under the manual, what constitutes chronic or excessive absenteeism "depends on the circumstances of the individual case." (<u>Id.</u>) "Accurate documentation must be maintained in order to prevail on this charge." (<u>Id.</u>) "Each manager and or supervisor is required to maintain accurate and current time records." (<u>Id.</u>)

Sometime in 2011, Ms. Bravo asked Mr. Kobitz if she could purchase vacation time because she had used her vacation days to take FMLA leave in 2010. Mr. Kobitz refused her request and told her that no one was allowed to purchase vacation time for 2011. However, Ms. Bravo learned that two other BOE employees had been allowed to purchase vacation time. Claudia Martins of the Union County Personnel Department testified that Ms. Bravo was not allowed to purchase vacation time in 2011 because she was an "abuser of time." (Simitz Cert., Ex. Y.) She further testified that Mr. Kobitz has discretion to grant or deny a BOE employee's request to purchase vacation time. (<u>Id.</u>)

5

On May 12, 2011, Ms. Bravo was suspended for two days because she had used more than half of her annual sick days.[2] She did not appeal or otherwise challenge the suspension. Sometime in the middle of 2011, John DeSimone, Chairman of the Board of Elections, told Ms. Bravo that her attendance was suffering and that she might not be reappointed for the following year.

In July 2011, Ms. Bravo told Mr. Kobitz that she needed to take days off for sinus surgery. Mr. Kobitz responded: "You know you're on probation and it doesn't, you know, it doesn't look good. You were starting to do better." (Rostan Cert., Ex. 11.) Ms. Bravo told Mr. Kobitz that she was tired of being sick all of the time but really needed the surgery. Thus, Mr. Kobitz allowed her to take time off for the surgery, which took place from August 26, 2011 through September 2, 2011. Ms. Bravo returned to work on September 5, 2011.

On September 6, 2011, Mr. Kobitz sought major discipline against Ms. Bravo, pursuant to N.J.S.A. 40A:9-25, and decided that he was going to recommend that she not be reappointed for the following year. That same day, a Notice of Disciplinary Charges, signed by Mr. Kobitz, was issued to Ms. Bravo, stating that she had exceeded her 15 sick days and that Mr. Kobitz recommended that she be suspended without pay for a period of 15 days. See (Simitz Cert., Ex. M.)

Ms. Bravo retained counsel to represent her in the matter, and, in late 2011, she and Defendants entered into a settlement agreement. The agreement provides that Ms. Bravo would accept a penalty of six suspension days without pay, serving four of those days without pay at the discretion of Union County and remaining free of the other two days if she incurred no further discipline for a one-year period. See (Simitz Cert., Ex. O.) In exchange, Ms. Bravo agreed to

---

[2] Two other BOE employees were suspended at that time for the same reason.

release Defendants from liability "regarding any and all circumstances related to" the disciplinary matter.  See (id.)

In the middle of October 2011, Ms. Bravo was diagnosed with PTSD, anxiety, and depression.  Her doctor gave her the option of either inpatient hospitalization or intensive outpatient treatment starting as soon as possible.  She chose outpatient treatment.

When Ms. Bravo informed Mr. Kobitz that she required emergent FMLA leave, Mr. Kobitz said, "You are on probation.  You have to use your own time.  I don't know what's going to happen with your reappointment.  It is not looking good."  (Rostan Cert., Ex. 6.)  He also told her that "[w]e have an election coming up.  This is not a good time for you to go out on FMLA leave.  Do what you have to do but I'm just telling you that you are in jeopardy."  (Id.)

Moreover, despite multiple requests by Ms. Bravo, Mr. Kobitz failed to provide her with FMLA paperwork, resulting in a two-week delay of the approval process.  Mr. Kobitz told Ms. Bravo that this delay was due to the Union County Personnel Department's failure to send him the FMLA paperwork in a timely manner.  However, he admitted during deposition that he had completely forgotten about Ms. Bravo's FMLA leave in between her requests for paperwork, and it is undisputed that had he called the Union Country Personnel Department to request the paperwork, he would have received it immediately via fax.

On October 24, 2011, Ms. Bravo's attorney sent Mr. Kobitz a letter requesting that he provide Ms. Bravo with the appropriate FMLA paperwork and contending that the delay in her receiving the paperwork amounted to interference or retaliation.  Shortly thereafter, Ms. Bravo's FMLA leave was approved.  She took leave from October 31, 2011 through December 5, 2011.

On December 6, 2011, while Ms. Bravo was still on FMLA leave, Mr. Kobitz met with the BOE Commissioners and recommended that Ms. Bravo not be reappointed for the following

year based on her attendance and poor work performance.[3]  The Commissioners acted on Mr.

Kobitz's recommendation and voted to not reappoint her.[4]  Shortly thereafter, Ms. Bravo was

informed that she would not be reappointed to her position in 2012.  Consequently, on December

31, 2011, her employment with the BOE was terminated.

## II.     DISCUSSION

Defendants now move for summary judgment in their favor on Ms. Bravo's claims.  In

doing so, they argue that Ms. Bravo cannot establish (1) a violation of the FMLA or NJLAD; or

(2) that Mr. Kobitz aided and abetted any discrimination.  Ms. Bravo opposes the motion,

arguing that there is ample evidence of (1) retaliation against her for taking FMLA leave and

interference with her FMLA rights; (2) disparate treatment and discrimination under the NJLAD;

(3) Defendants' failure to reasonably accommodate her disability under the NJLAD; and (4) Mr.

Kobitz's individual liability for aiding and abetting discrimination under the NJLAD.

Ms. Bravo moves for summary judgment in her favor on her claim for FMLA

interference.  In doing so, she argues that Defendants (1) failed to properly designate the time

taken for sinus surgery FMLA qualifying leave; and (2) discouraged her taking FMLA leave.

Defendants oppose the motion, arguing that this claim is barred because Ms. Bravo (1) never

made mention of FMLA interference with respect to her sinus surgery in the pleadings or

discovery responses; and (2) waived her right to assert any such interference claim in the 2011

settlement agreement.  Defendants further argue that Ms. Bravo's interference claim fails

---

[3] Mr. Kobitz had no firsthand knowledge of Ms. Bravo's work performance but claims he learned about it from her direct supervisors.  Defendants submit notes of one of Ms. Bravo's supervisors indicating instances of poor work performance.  See (Simitz Cert., Ex. W.)

[4] Commissioner John DeSimone certifies that the BOE Commissioners were not aware that Ms. Bravo was on FMLA leave at the time they were considering her reappointment.

because (1) she failed to properly notify them that she required FMLA leave; and (2) there is no evidence of damages arising out of the alleged interference.

## A. Standard of Review

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Id. Disputes over irrelevant or unnecessary facts will not preclude granting summary judgment.

The party moving for summary judgment has the burden of showing that no genuine dispute of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party does not bear the burden of proof at trial, it may discharge its burden under the summary judgment standard by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325. If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine factual dispute exists and a trial is necessary. Id. at 324. In meeting its burden, the non-moving party must offer specific facts that establish a material dispute, not simply create "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In deciding whether a dispute of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The Court's function, however, is not to weigh the evidence and rule on the truth of the matter, but rather to determine whether there is a genuine

issue for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). If there are no issues that require a trial, then judgment as a matter of law is appropriate. <u>Id.</u> at 251-52.

## B.  Ms. Bravo's FMLA Claims

The primary purposes behind the FMLA are to (1) "balance the demands of the workplace with the needs of families" and (2) "entitle employees to take reasonable leave for medical reasons." 29 U.S.C. § 2601(b)(1). The FMLA endeavors to accomplish these purposes "in a manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b)(3).

The FMLA contains two relatively distinct types of provisions. First, it creates a series of prescriptive substantive rights for eligible employees, often referred to as the "entitlement" or "interference" provisions, which set floors for employer conduct. <u>Callison v. City of Philadelphia</u>, 430 F.3d 117, 119 (3d Cir. 2005). Eligible employees "shall be entitled to a total of twelve workweeks of leave during any twelve-month period" if the employee has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Following a qualified absence, the employee is entitled to be reinstated to the former position or an alternate one with equivalent pay, benefits and working conditions. 29 U.S.C. § 2614(a)(1).

The FMLA declares it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" in the statute. 29 U.S.C. § 2615(a)(1). "Such a claim is typically referred to as an interference claim, and is acknowledged to set floors for employer conduct." <u>Sommer v. The Vanguard Grp.</u>, 461 F.3d 397, 399 (3d Cir. 2006) (quotations omitted). "To assert an interference claim, the employee only needs to show that [s]he was entitled to benefits under the FMLA and that [s]he was denied them." <u>Id.</u> (quotation omitted). "An interference action is not about discrimination, it is only about whether the

employer provided the employee with the entitlements guaranteed by the FMLA." Id. (quotation omitted).

Second, the FMLA provides protection against discrimination based on the exercise of these rights, often referred to as the "discrimination" or "retaliation" provisions. See 29 U.S.C. § 2615(a)(1) and (2); 29 C.F.R. § 825.220(c) ("An employer is prohibited from discriminating or retaliating against an employee . . . for having exercised . . . FMLA rights."). Employers may not "use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." 29 C.F.R. § 825.220(c).

To set forth claim of retaliation, Ms. Bravo must show that "(1) [s]he took an FMLA leave, (2) [s]he suffered an adverse employment decision, and (3) the adverse decision was causally related to h[er] leave." Conoshenti v. Public Service Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir. 2004). She may do so either through direct or circumstantial evidence.

Direct evidence of retaliation is demonstrated through the burden shifting framework set forth by the Supreme Court in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). "Under the Price Waterhouse framework, when an FMLA plaintiff alleging unlawful termination presents 'direct evidence' that his [FMLA leave] was a substantial factor in the decision to fire him, the burden of persuasion on the issue of causation shifts, and the employer must prove that it would have fired the plaintiff even if it had not considered [the FMLA leave]." Conoshenti, 364 F.3d at 147 (quotation omitted). "Direct evidence means evidence sufficient to allow the jury to find that the decision makers placed substantial negative reliance on [the FMLA leave] in reaching their decision to fire him." Id. at 147 n.10 (quotation and citations omitted).

"[T]o convince the trier of fact that it is more likely than not that the decision would have been the same absent consideration of the illegitimate factor[,] [t]he employer need not isolate

the sole cause for the decision; rather it must demonstrate that with the illegitimate factor removed from the calculus, sufficient business reasons would have induced it to take the same employment action." Price Waterhouse, 490 U.S. at 276-77. "This evidentiary scheme essentially requires the employer to place the employee in the same position he or she would have occupied absent discrimination." Id. at 277.

In contrast, circumstantial evidence of retaliation under the FMLA is demonstrated through the familiar analytical framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 (1973). Parker v. Verizon Pennsylvania, Inc., 309 Fed. App'x. 551, 555 (3d Cir. 2009). The McDonnell Douglas analysis proceeds in three stages. As applicable here, Ms. Bravo must first establish a prima facie case of discrimination under the FMLA. McDonnell Douglas, 411 U.S. at 802. If she succeeds in establishing a prima facie case, the burden shifts to Defendants "to articulate some legitimate, nondiscriminatory reason for" the adverse employment action. Id. If Defendants meet this burden, Ms. Bravo must then provide evidence that the legitimate reason offered by Defendants is merely a pretext for discrimination. Id. at 804-05.

Ms. Bravo maintains that Defendants violated her FMLA rights by (1) improperly placing her on probation for the 2011 year based on inaccurate attendance data; (2) denying her the request to purchase vacation time; (3) failing to properly designate her leave for sinus surgery as FMLA leave; (4) discouraging her from taking time off for sinus surgery in the summer of 2011; (5) seeking discipline against her as soon as she returned from sinus surgery; (6) discouraging her from taking emergent FMLA leave in the fall of 2011; (7) delaying receipt of FMLA paperwork for her emergent FMLA leave; and (8) deciding to not reappointing her for 2012 while she was out on FMLA leave.

Defendants counter that Ms. Bravo was appropriately placed on probation for 2011 due to excessive absences in 2010, and that she was denied the opportunity to purchase vacation time because of her probation status as an abuser of time. They further contend that Ms. Bravo cannot seek relief for Defendants' failure to designate her sinus surgery as FMLA leave, or disciplining her upon return from sinus surgery, because she (1) never set forth any relevant allegations in her pleadings or discovery responses; (2) waived her right to do so in the 2011 settlement agreement with the BOE; and (3) never requested FMLA leave in the first place. Defendants do not dispute that Mr. Kobitz's discouragement of Ms. Bravo's FMLA leave in the fall of 2011, and his failure to provide her with FMLA paperwork for that leave in a timely manner, amounts to interference under the FMLA. However, according to Defendants, Ms. Bravo's claim under the FMLA for this interference fails because there is no evidence of resulting damages. Finally, Defendants argue that they had ample cause to not reappoint Ms. Bravo for 2012 separate and apart from her FMLA leave.

### i.     *Ms. Bravo's Probation Status in 2011 for Excessive Absences in 2010*

It is unclear from the pleadings and briefs whether Ms. Bravo seeks to characterize Defendants' imposition of probation as a claim for interference or retaliation under the FMLA. However, the Court finds that claim to be one for retaliation because it involves disciplinary action subsequent to FMLA leave. See 29 C.F.R. § 825.220(c). Because Ms. Bravo sets forth circumstantial evidence of Defendants' consideration of her FMLA leave in imposing probation, the Court will apply the McDonnell Douglas framework.

Ms. Bravo has set forth a prima facie case of retaliation. She took FMLA leave during the summer of 2010 and was placed on probation at the end of that year for 2011.[5]  A reasonable

_____

[5] Defendants argue that their imposition of probation was not an adverse employment action under the FMLA. An adverse employment action under the FMLA is one that "well

jury could find that her probation was related to her 2010 FMLA leave because she was placed

on probation for excessive use of sick leave during the 2010 year.[6]  Thus, the burden shifts to

Defendants to articulate a legitimate, non-discriminatory reason for placing Ms. Bravo on

probation for 2011.

Defendants contend that they did so because, notwithstanding her FMLA leave, Ms.

Bravo exceeded her annual 15 sick days because she took 12.5 days of sick leave before her

FMLA leave and five unpaid sick days afterwards.  They further contend that there is no

evidence of discrimination against Ms. Bravo because three other individuals with superior

attendance records were also placed on probation for 2011 for attendance issues.

Thus, the burden shifts back to Ms. Bravo to show that these reasons are merely a pretext

for discrimination.  A reasonable jury could find that Ms. Bravo has satisfied that burden.  She

submits evidence that she had in fact accrued 26 sick days for 2010, and was required to exhaust

those days, as well as her vacation days, in order to take FMLA leave.  To be sure, the Union

County FMLA policy gives employees the option of using both accrued paid sick leave and

---

might have dissuaded a reasonable worker from exercising a right under the FMLA."  DiCampli
v. Korman Communities, 257 Fed App'x. 497, 501 (3d Cir. 2007) (quotation omitted).  There
can be little doubt that receiving probation for taking excessive sick leave, including FMLA
leave, would dissuade a reasonable employee from taking FMLA leave in the future.

[6] Defendants argue that there is no evidence from which to infer that the BOE took Ms.
Bravo's FMLA leave into account in imposing probation because there is no indication that the
BOE Commissioners were made aware that Ms. Bravo had taken FMLA leave.  This argument
proves too much.  In imposing probation, the Commissioners relied on the recommendation of
Mr. Kobitz—who knew that Ms. Bravo had taken FMLA leave—and the information he
provided in support of his recommendation.  Indeed, under the Union County Disciplinary
Action Manual, it is Mr. Kobitz's responsibility to maintain accurate attendance records and to
present those records to the BOE Commissioners when recommending disciplinary action for
chronic or excessive absenteeism.  See (Rostan Cert., Ex. 1.)  Thus, a reasonable jury could find
that, as a practical matter, Defendants took Ms. Bravo's FMLA leave into account when
imposing probation.  To hold otherwise would allow employers to concoct a disciplinary
mechanism that allows them to penalize FMLA leave with impunity.

vacation leave in order to continue receiving their salary during an FMLA leave, <u>see</u> (Rostan Cert., Ex. 3), and the FMLA allows for such an arrangement.[7]  <u>See</u> 29 C.F.R. § 825.207(a). Nonetheless, employers may not consider FMLA leave, paid or unpaid, as a basis on which to discipline their employees.  <u>See</u> 29 C.F.R. § 825.220(c).  Here, because Ms. Bravo would not have exceeded her 26 days of sick leave without taking FMLA leave, a reasonable jury could find that Defendants put her on probation, in part, because of her FMLA leave.  Consequently, Defendants' Motion for Summary Judgment on Bravo's FMLA claims, as they relate to her probation, is denied.

### ii.       *Denial of Request to Purchase Vacation Time*

The record makes clear that Defendants' denial of Ms. Bravo's request to purchase vacation time was based at least in part on her probation status.  Indeed, their stated reason for denying her request was that she was on probation and an abuser of time.  However, as previously discussed, there remains a factual question of whether Defendants improperly took Ms. Bravo's 2010 FMLA leave into account in deciding to impose probation.  Because Defendants' denial of Ms. Bravo's request to purchase vacation time was based at least in part on her probation status, a reasonable jury could find that, by extension, Defendants improperly considered her 2010 FMLA leave in denying that request.  Consequently, Defendants' Motion for Summary Judgment on Ms. Bravo's FMLA retaliation claim, as it relates to the denial of her request to purchase vacation time, is denied.

### iii.      *Ms. Bravo's Sinus Surgery*

Ms. Bravo's claims for FMLA violations arising out of her sinus surgery fail because they were set forth in neither the pleadings nor discovery responses.  Each and every claim for

---

[7] There is no indication that Ms. Bravo was given the option of taking paid or unpaid FMLA leave.

relief that a plaintiff seeks to press must be set forth in the Complaint. To the extent the plaintiff discovers new information giving rise to additional claims, the plaintiff must amend the Complaint to assert those claims and properly put the defendant on notice of them.

Ms. Bravo's failure to assert FMLA violations, in the original or Amended Complaint, based on the circumstances surrounding her sinus surgery, precludes her from asserting that claim at the summary judgment stage. Without prior notice of that claim, Defendants were deprived of the opportunity to fully explore it during discovery and discharge their burden at the summary judgment stage. Thus, to allow Ms. Bravo to seek summary judgment in her favor on a claim that Defendants had no prior notice of would violate basic tenets of due process and fair play. Accordingly, Defendants' Motion for Summary Judgment on Ms. Bravo FMLA claims arising out of her 2011 sinus surgery is granted, and Ms. Bravo's Motion for Summary Judgment on those claims is denied.

### iv.     Interference Regarding Ms. Bravo's FMLA Leave in the Fall of 2011

Defendants' argument that Ms. Bravo's claim for FMLA interference arising out of her fall 2011 FMLA leave merits dismissal because she suffered no damages is unpersuasive. To be sure, mere technical FMLA violations are not actionable. See Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89 (2002) (The FMLA "provides no relief unless the employee has been prejudiced by the violation[.]"); Conoshenti, 364 F.3d at 143 (The FMLA "affords no relief absent prejudice from a statutory violation." (citing Ragsdale, 535 U.S. at 88, 89)). However, courts in this Circuit have found that discouraging an employee from taking FMLA leave may result in prejudice by inhibiting the employee from asserting their FMLA rights in the future. See Sabbrese v. Lowe's Home Ctrs. Inc., 320 F. Supp. 2d 311, 330 (W.D.Pa. 2004) ("[R]easonable persons could conclude" that disciplining an employee for taking FMLA leave

"chilled or otherwise discouraged" the employee's "assertion of his FMLA rights" by leaving him "without reasonable assurances that he would be permitted to exercise his FMLA rights without interference in the future."); Shtab v. Great Bay Hotel and Casino, Inc., 173 F. Supp. 2d 225, 267-68 (D.N.J. 2001) ("[R]easonable persons could conclude that" asking an employee to delay FMLA leave "chilled [his] assertion of rights under the FMLA . . . .). Indeed, the FMLA regulations specifically state that "[i]nterfering with the exercise of an employee's rights [under the FMLA] would include . . . not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b).

Here, a reasonable jury could find that, upon Ms. Bravo's request for emergent FMLA leave, Mr. Kobitz's statements that (1) she had to use her own time; (2) her reappointment for the following year was not looking good and was in jeopardy; and (3) it was not a good time for her to go out on FMLA leave would inhibit her from exercising her FMLA rights in the future. Furthermore, a reasonable jury could find additional prejudice in Mr. Kobitz's failure to provide Ms. Bravo with FMLA paperwork in a timely manner. Indeed, she suffered a two-week delay in receiving treatment and even had to have a lawyer send a threatening letter to Mr. Kobitz in order to receive her FMLA paperwork at all. This, too, could inhibit her from exercising her FMLA rights in the future. Consequently, both Defendants' and Ms. Bravo's Motion for Summary Judgment on Ms. Bravo's claim for FMLA interference as it relates to her fall 2011 FMLA leave is denied.

### v. *Ms. Bravo's Non-Reappointment*

Ms. Bravo contends that, at the time Ms. Bravo requested FMLA leave in the fall of 2011, Mr. Kobitz's statement that her reappointment for the following year was in jeopardy and was not looking good, combined with her non-reappointment while she was out on FMLA leave,

amounts to direct evidence retaliation under <u>Price Waterhouse</u>. Defendants argue that, in deciding to not reappoint Ms. Bravo, no reasonable jury could find that they placed substantial reliance on her FMLA leave because (1) Mr. Kobitz decided to recommend to the BOE Commissioners that they not reappoint Ms. Bravo months before the Commissioners made their decision; and (2) the BOE Commissioners had no knowledge that Ms. Bravo was on FMLA leave when they decided not to reappoint her.

Defendants' arguments are unavailing. The record is clear that while Mr. Kobitz has the authority to recommend a BOE employee for non-reappointment to the BOE Commissioners, only the BOE Commissioners have the power to not reappoint the employee. Thus, a reasonable jury could find that the decision to not reappoint Ms. Bravo was in fact made at their annual meeting when Ms. Bravo was out on FMLA leave. And while the BOE Commissioners may not have had knowledge that that Ms. Bravo was out of FMLA leave at the time they decided to not reappoint her, they relied substantially on the recommendation of Mr. Kobitz—who knew she was out on FMLA leave—and the information he provided in support of his recommendation. <u>See</u> Note 6. Thus, Mr. Kobitz's statement to Ms. Bravo at the time she requested FMLA leave that her reappointment was not looking good and was in jeopardy, combined with the decision to not reappoint her while she was out on FMLA leave and Mr. Kobitz's role in reaching that decision, would allow a reasonable jury to infer direct evidence of retaliation.

Consequently, the burden shifts to Defendants to show that they would have chosen to not reappoint Ms. Bravo notwithstanding her FMLA leave. Defendants point to the fact that Ms. Bravo was properly and progressively disciplined for excessive absenteeism during 2011, beginning with her probation in 2010 and ending in her non-reappointment at the end of 2011. Defendants also note that BOE Chairman DeSimone told Ms. Bravo before her fall 2011 FMLA

leave that she had a poor attendance record, was a poor employee, and might not be reappointed for the following year. However, as previously discussed, there is a factual question of whether Defendants imposed probation on Ms. Bravo in 2010 based on inaccurate information and in violation of the FMLA and imposed further discipline based in part on that probation. There is also a factual question of whether Chairman DeSimone's statement to Ms. Bravo was based in part on the aforementioned potentially inaccurate attendance records.[8] Consequently, Defendants' Motion for Summary Judgment on Ms. Bravo's FMLA retaliation claim as it relates to her non-reappointment is denied.

**C.     Ms. Bravo's Claims under the NJLAD**

The NJLAD prohibits "any unlawful discrimination against any person because such person is or has been at any time disabled or any unlawful employment practice against such person, unless the nature and extent of the disability reasonably precludes the performance of the particular employment." N.J.S.A. 10:5-4.1. A qualifying disability under the NJLAD includes a "physical disability, infirmity . . . any mental, psychological or developmental disability . . . ." N.J.S.A. 10:5-5(q).

There are two distinct categories of discrimination under the NJLAD: disparate treatment and the failure to accommodate. Tynan v. Vicinage 13 of Superior Court, 351 N.J. Super. 385, 397 (App. Div. 2002). Both incorporate the McDonnell Douglas burden shifting framework previously discussed with respect to Ms. Bravo's FMLA retaliation claims. Ms. Bravo asserts claims for disparate treatment and failure to accommodate under the NJLAD.[9]

---

[8] Moreover, Chairman DeSimone's statement merely indicates that Ms. Bravo's reappointment was in jeopardy, not that it was certain that she would not be reappointed.

[9] Ms. Bravo also asserts an aiding and abetting claim under the NJLAD against Mr. Kobitz and the BOE. However, because Defendants are entitled to summary judgment on Ms.

###### i.     *Ms. Bravo's Disparate Treatment Claims*

To make a prima facie case of disparate treatment under the NJLAD, Ms. Bravo must show that (1) she was disabled within the meaning of the NJLAD; (2) she had been performing her work "at a level that met Defendants' legitimate expectations"; (3) she "nevertheless had been required to labor under conditions that were unreasonably different from those of other employees, had been transferred, or had been fired; and (in the case of discriminatory transfer or discharge) (4) [Defendants] had sought another to perform the same work after [Ms. Bravo] had been removed from [her] position." Maher v. New Jersey Transit Rail Operations, Inc., 125 N.J. 455, 480-81 (1991).

Ms. Bravo claims that Defendants engaged in disparate treatment because of her disabilities by (1) denying her the opportunity to purchase vacation time while allowing other employees to do so; (2) subjecting her to more severe discipline than other employees for absenteeism;[10] and (3) not reappointing her for 2012.

The record is clear that Ms. Bravo suffered from multiple cognizable disabilities under the NJLAD, including PTSD, depression, and asthma. Thus, she has met the first prong of a prima facie case. She has also met the second prong because despite her absences, a reasonable jury could find that she nonetheless performed her job at a level that met Defendants' legitimate expectations.[11] With respect to the third prong, Ms. Bravo fails to show that she was disciplined

---

Bravo's disparate treatment and failure to accommodate claim under the NJLAD, her aiding and abetting claim is dismissed as moot.

[10] To be sure, this claim cannot encompass Ms. Bravo's discipline for taking leave for sinus surgery in 2011 for the same reasons as those that preclude her from asserting that claim in the FMLA context.

[11] Defendants do not contend that Ms. Bravo's chronic absenteeism deprived her of the ability to perform the essential functions of her job.

in an unreasonably different manner than other employees.  Indeed, the record indicates that three other BOE employees that had superior attendance records were put on probation for poor attendance at the same time as Ms. Bravo, and she fails to point to any example of similarly situated employees that did not receive discipline.  While she points to examples of other employees that were allowed to purchase vacation time, there is no indication that those employees were also on probation for attendance.  Finally, Ms. Bravo fails to point to any evidence that Defendants hired someone to fill her position after her termination.  Thus, Ms. Bravo has failed to make a prima facie case of disparate treatment under the NJLAD.

Even if Ms. Bravo had made a prima facie case of disparate treatment, she cannot show that Defendants' legitimate, non-discriminatory reason—excessive and chronic absenteeism—for disciplining her and ultimately terminating her employment was a pretext to discriminate against her on the basis of her disabilities.  Indeed, there is no evidence whatsoever that her discipline and termination had to do with anything other than her chronic and excessive absenteeism.[12]  See Svarnas v. AT&T Commc'ns., 326 N.J. Super. 59, 77 (App. Div. 1999) ("[C]hronic and excessive absenteeism," even for a recognized disability under the NJLAD, "need not be accommodated.").  Accordingly, Defendants' Motion for Summary Judgment on Ms. Bravo's disparate treatment claim under the NJLAD is granted.

### ii.      *Ms. Bravo's Failure to Accommodate Claim*

Although the NJLAD does not specifically address the issue of reasonable accommodation, New Jersey courts "have uniformly held that the [NJLAD] nevertheless requires an employer to reasonably accommodate an employee's handicap."  Victor v. State, 401 N.J.

---

[12] Ms. Bravo points to hearsay evidence of comments made in the past by Mr. Kobitz about other individuals with disabilities and a stray remark at one point about Ms. Bravo limping.  However, there is no indication that these comments had anything to do with her reasons for taking sick leave, much less her discipline or termination.

Super. 596, 610 (App. Div. 2008) (quotation and citations omitted). "Consistent with this interpretation, the regulations promulgated under the statute provide that an employer must make a reasonable accommodation to the limitations of a handicapped employee, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its business." Id. (citing N.J.A.C. 13:13-2.5(b)).

"To determine what appropriate accommodation is necessary, the employer must initiate an informal interactive process with the employee." Tynan, 351 N.J. Super. at 400 (citation omitted). "This process must identify the potential reasonable accommodations that could be adopted to overcome the employee's precise limitations resulting from the disability." Id. "Once a handicapped employee has requested assistance, it is the employer who must make the reasonable effort to determine the appropriate accommodation." Id.

"To show that an employer failed to participate in the interactive process, a disabled employee must demonstrate: (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith." Id. at 400-01.

Ms. Bravo claims that Defendants denied her reasonable accommodation by immediately refusing her request to purchase vacation time in 2011. This claim fails because there is no indication that her request to purchase vacation time was intended to accommodate her disabilities. See Tynan, 351 N.J. Super. at 400 ("While there are no magic words to seek an accommodation, the employee, however, must make clear that . . . assistance [is desired] for his or her disability.") (quotations omitted). To the contrary, the record is clear that she wanted to

purchase vacation time because she had previously used her vacation days to care for her mother. Consequently, Defendants' Motion for Summary Judgment on Ms. Bravo's claim for failure to accommodate under the NJLAD is granted.

### III.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED with respect to Ms. Bravo's claims under the NJLAD, in their entirety, and her claims under the FMLA, as they relate to her sinus surgery in 2011, but DENIED with respect to her other FMLA claims.  Ms. Bravo's Motion for Summary Judgment is DENIED in its entirety.  Ms. Bravo's claims under the NJLAD, in their entirety, and those under the FMLA, as they relate to her 2011 sinus surgery, are dismissed with prejudice.

The Court will issue an order implementing this opinion.

  **/s/ Dickinson R. Debevoise_____**
  DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: May 23, 2013